938 So.2d 702 (2006)
Joseph Arthur SIMS and Julia Brumfield Sims
v.
Barry WARD and the Louisiana Department of Public Safety and Corrections Division of Louisiana State Police.
No. 2005-CA-0278.
Court of Appeal of Louisiana, First Circuit.
June 9, 2006.
Rehearing Denied July 17, 2006.
*703 Mary Olive Pierson, Baton Rouge, Counsel for Plaintiffs/Appellants.
Timothy D. Scandurro, Dewey M. Scandurro, Scandurro & Layrisson, L.L.C., New Orleans, Counsel for Plaintiffs/Appellants.
Charles C. Foti, Jr., Attorney General, Patrick J. Berrigan, Special Assistant Attorney General, Slidell, Counsel for Defendants/Appellees.
Panel composed of Ad Hoc Judges EDWARD A. DUFRESNE, Jr., THOMAS F. DALEY, and FREDERICKA HOMBERG WICKER.
EDWARD A. DUFRESNE, Jr., Chief Judge, Ad Hoc.
In this appeal, plaintiffs, Joseph and Julia Sims, challenge the jury verdict which found no liability on the part of defendants, Barry Ward and the Louisiana State Police. Plaintiffs, asserting there is no factual basis for the verdict, request that this court reverse the jury verdict and thereafter make an appropriate award of damages. For the reasons which follow, we affirm the verdict of the jury.
In the early morning hours of June 3, 2000, Joseph Arthur Sims, a fifty-eight year old attorney, was driving home from his high school reunion when he was stopped by Barry Ward, a trooper with the Louisiana State Police. Sims and Ward have very different versions of what occurred during the stop. Sims contends that he was cooperative during the stop, and that Ward became angry when he refused to take a part of the field sobriety test. He asserts that Ward handcuffed and then beat him. On the contrary, Ward claims that Sims was uncooperative and resisted arrest. As a result, Ward had to use some defensive techniques that he learned in the police academy to get Sims under control. As a result of this stop, Sims and his wife, Julia Sims, filed a petition for damages against Barry Ward and the Louisiana Department of Public Safety and Corrections, Division of State Police, alleging that Ward used excessive force in effecting the arrest of Sims. In the petition, Sims asserted claims and sought damages under Louisiana tort law as well as 42 U.S.C. § 1983. Mrs. Sims sought damages for mental anguish and grief and loss of consortium.
This matter proceeded to trial on March 29, 2004, in the 21st Judicial District Court. After lengthy testimony and the *704 presentation of evidence by both plaintiffs and defendants, the jury reached a verdict in favor of defendants. Specifically, the jury found that Ward did not use excessive force during the arrest of Sims; that Ward did not commit a battery on Sims; that Ward and/or the Division of State Police did not defame Sims; that Ward and/or the Division of State Police did not cause the malicious prosecution of Sims; and that the Division of State Police was not negligent in hiring Ward or retaining Ward as a trooper. The jury also rejected the claims of Mrs. Sims, finding that she did not sustain damages for loss of consortium or mental anguish and emotional distress. On April 26, 2004, the court entered a judgment in accordance with the jury verdict. Thereafter, plaintiffs filed a motion for judgment notwithstanding the verdict, and in the alternative, a motion for new trial. After considering arguments of counsel, the trial judge denied the motion. This timely appeal followed.

SPECIFICATION OF ERROR NUMBER ONE
In their first specified error, plaintiffs challenge the verdict of the jury. Plaintiffs acknowledge the manifest error standard of review and recognize that they have an "uphill battle" to reverse the jury's verdict. However, plaintiffs submit that a reversal is warranted in this case because the verdict is not supported by any view of the evidence, much less any reasonable view. They contend that the testimony and the physical evidence support only one verdict, specifically that Sims was brutally beaten about the head and face after he was lying on the ground, handcuffed. Plaintiffs allege that rather than being persuaded by the evidence, the jury was influenced by the inflammatory and prejudicial remarks of defense counsel.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La. 1989). In Bonin v. Ferrellgas, Inc., XXXX-XXXX (La.7/2/04), 877 So.2d 89, 94-95, the Louisiana Supreme Court stated:
Under the manifest error standard, in order to reverse a trial court's determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). On review, an appellate court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221. In sum:
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. (Emphasis added.)
*705 Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973); Ambrose, supra at 224 n. 1 (Lemmon, J., concurring).
However, this Court clarified in Ambrose that our purpose in Stobart was not "to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset." Perkins v. Entergy Corp., XXXX-XXXX (La.3/23/01), 782 So.2d 606, supra at 613 (citing Ambrose, 639 So.2d at 221). Recognizing that great deference should be accorded to the fact finder, the court of appeal and this Court have a constitutional duty to review facts. Id. To perform its constitutional duty properly, an appellate court must determine whether the trial court's conclusions were clearly wrong based on the evidence or clearly without evidentiary support. Id. That being said, we reiterate that when two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong.
In order to address plaintiffs' first specification of error, it is necessary to review some of the evidence presented at trial. In the present case, Joseph Sims was the first witness to testify. After giving some personal background information, Sims told about his activities before the police stop. On June 2, 2000, Sims went to his high school reunion with his wife, although they drove in two separate cars. He admitted having some drinks during the course of the evening. When the reunion was over, Sims made a few stops and then proceeded home. As he was driving down Highway 22, he saw police lights in his rearview mirror. Right before he saw the lights, Sims had jerked his steering wheel to the left, claiming he had moved too close to the fog line when he reached down to put away his phone. Realizing the lights were for him, Sims pulled into the parking lot of Delatte's Grocery because the area was well lit. Sims parked his car on the pavement portion of the parking lot and turned it off. Sims took off his seatbelt, opened the car door, and as he exited, got caught in his seatbelt. At this point, he heard the state trooper tell him to go stand by the police unit. Doing as he was told, Sims walked over to Ward's car, which was situated on the gravel portion of the parking lot. Ward approached Sims and told him in a loud voice that he smelled alcohol on him. Ward asked to see Sims' driver's license and then informed Sims that he wanted to perform a field sobriety test. Sims responded that he would not take any tests that were subjective in nature, including the horizontal gaze nystagmus test which the officer wanted to perform. According to Sims, Ward became very irritated when he refused to take this test. Ward began yelling, telling Sims that he was refusing to cooperate. Sims looked down to put his wallet in his pocket, and as he looked back up, Ward attempted to do the horizontal gaze nystagmus test. To prevent Ward from performing the test, Sims ducked his head, and Ward began yelling that he was refusing to cooperate.
Feeling that the officer had gone into a rage and had become unduly confrontational, Sims feared for his life and thought he should remove himself from the situation. Sims informed Ward that he was going to sit in his car to wait for a supervisor and to do what he needed to do. When Sims took a step towards his car, Ward grabbed his left bicep. Sims stopped. Ward grabbed Sims' left wrist and cuffed his left arm, yelling that Sims was resisting arrest. Ward then grabbed Sims' right arm and pulled it towards the back. However, Ward lost his grip of the arm and yelled at Sims to stop fighting. At that point in time, Ward went to grab Sims, and Sims went down to the ground. Sims testified that he landed on his right *706 knee, pitched forward onto his right elbow, and then rolled onto his left shoulder. Positioned flat on the broken concrete, Sims put his right hand behind his back, and Ward cuffed it. Sims stated that when he initially went down, he did not injure his neck, face, or head, and that his face did not hit the concrete.
After Sims was on the ground and handcuffed, Ward reached down, grabbed Sims by his right arm, jerked him up, and let him drop. However, Sims' head still did not hit the concrete because the officer had not lifted him up too high. Ward then got on Sims' back, grabbed him by the hair, pulled his head back, and jammed his head into the concrete and broken rocks. Sims hit his right forehead area and busted his lip. Ward pulled his head back a second time, and as the officer went to smash it down, Sims quickly turned his head to the right to prevent his teeth from being knocked out. On this contact, Sims' right temple area hit the ground. Still holding Sims' hair, Ward rubbed his face into the broken gravel. Sims turned his head to the left in order to get the injured side out of the gravel. Ward then pounded him with "sledge hammer blows" on the side of his head. At this point, Sims heard a car pull up in the gravel. Ward got off Sims' back, and as he was doing so, Ward stomped his foot on the side of Sims' head and turned it, causing his head to rotate.
Ward also testified at trial but presented a totally different version of events. On the night in question, Ward was on patrol when he observed Sims' vehicle cross the center line three times and also cross the white fog line on the right hand side of the road. Believing that he may have a possible DWI, Ward turned on his blue lights to initiate a stop. The vehicle pulled into the parking lot of Delatte's Grocery, and Ward positioned his unit to the rear of the suspect vehicle and directed his headlights towards the driver's side door. As Sims exited his vehicle, Ward observed that his left arm was entangled in the seatbelt. Sims then stumbled out of the vehicle and nearly fell to the ground; however, he caught himself on the open door.
Ward, carrying his flashlight, approached Sims, identified himself, and asked for Sims' driver's license. Sims gave Ward his license and made some comment that he thought the trooper was his wife. As Sims spoke, Ward smelled a very strong odor of alcohol. After looking at Sims' license with his flashlight, Ward told Sims that he wanted to perform a field sobriety test. When Ward said those words, Sims reached to grab his steering wheel to try to get back into his car. Ward positioned himself to block Sims from getting back into the vehicle, and at some point, Sims grabbed the flashlight and would not give it back. Ward advised Sims to let go of the flashlight, but Sims refused. Ward then performed a weapon retention maneuver which broke Sims' grip on the flashlight. Ward told Sims to step in front of his unit. According to Ward, Sims composed himself, walked to the front of the unit, and stood with his arms crossed and his head down.
Ward approached Sims and advised him that he needed to do a series of tests, the first one being the horizontal gaze nystagmus test. Sims refused to take this test, commenting that he was an attorney and felt the test was subjective. As was his usual procedure, Ward nonetheless offered the test and held up his pen and flashlight to see if Sims would do the test. Sims looked straight down, and the officer advised him that he would move on to the walk and turn test. Sims refused this test, once again saying that he was an attorney and the test was subjective. As Ward was on the radio, Sims touched the trooper just *707 above his utility belt, told Ward not to put all those lies in there, and to get him a supervisor. Ward then advised Sims that if he would not do any of the tests, then he would be arrested. In response, Sims told Ward to do what he needed to do.
In compliance with Ward's instruction, Sims turned around and clasped his hands in the lower portion of his back. As Ward prepared to cuff him, Sims proceeded to walk back to his vehicle. Ward reached up and grabbed Sims by his left arm. Sims resisted and attempted to pull away from the officer; however, Ward managed to grab Sims' right arm, telling him that he was under arrest. At this point, Sims was still trying to pull back towards his vehicle as the officer was pulling back towards his unit. When Ward pulled Sims back, he was trying to execute an arm bar takedown, but was not able to get Sims in the proper position for the maneuver. Ward decided to do a rollover technique, and as he was executing the technique, Sims caught himself on the hood of the police unit. When Sims put his hands on the hood of the car, Ward had him in the position that he needed to do the arm bar takedown.[1]
Ward grabbed Sims by the left wrist, and as he pulled Sims off the car, Sims' right arm went into the air, and he landed on the ground on his face. The force of the impact combined with the sweat on Sims' arms made Ward lose his grip. However, Ward was able to hold him on the ground and get into the handcuffing position, which is left knee between the shoulder blade and neck and right knee in proximity to the rib cage. At this point, Sims, still resisting, clasped his hands together underneath his chest to prevent Ward from being able to handcuff him. After unsuccessful attempts to pull Sims' hands from underneath his body, Ward executed three brachial plexus strikes in the neck area. Ward was then able to grab Sims' left hand and cuff it. Sims continued to resist and put his left hand back underneath him. Ward grabbed Sims' right bicep and pulled as hard as he could to get that hand out. At some point in the struggle, he executed a finger maneuver and was finally able to handcuff Sims.
Several officers thereafter arrived on the scene. Sergeant David Bryant of the Ponchatoula Police Department was the first officer to arrive. Upon his arrival, Bryant observed Ward stooped beside a man who was lying on his stomach, handcuffed behind his back. Ward advised Bryant that Sims had put up a fight and asked Bryant to stand by Sims so he could clean himself up. Regarding Ward's condition, Bryant testified that Ward had some blood on his hands and arms and that he was breathing heavy. However, Bryant did not notice anything on Ward's clothing that indicated a struggle, such as tears or missing buttons. Bryant also testified that he saw some blood on Sims and the handcuffs.
Chief of Police of Ponchatoula, Tim Gideon, also arrived on the scene. Upon his arrival, he first spoke to Trooper Ward to ascertain if he was alright and if everything was under control. He then went over to see what the situation was with the violator and Officer Bryant. Chief Gideon looked at the suspect's driver's license and realized that it was Sims, whom he knew. In the meantime, Trooper Scott Sandage of the Louisiana State Police, who also *708 knew Sims, arrived on the scene. Sandage and Gideon attempted to sit Sims up. They then cleaned out his eyes and uncuffed him. Regarding Sims' condition, Gideon and Sandage testified that he was very scared, that he told them the trooper had beaten him up, and that he asked them not to leave him. Both described Sims' face as bloody with a lot of gravel and dirt. Gideon testified that he did not remember whether Sims' hands were filthy and bloody. Sandage testified that he did not see any blood on Sims' arms when he uncuffed him. Regarding Ward's condition, Sandage and Gideon indicated that when they arrived, Ward gave no appearance of having been in a struggle. Gideon testified that Ward was in regular uniform, that it did not appear to be torn, and that he did not notice any injuries to Ward. Sandage described Ward's uniform as spotless and his appearance as perfect.
Trooper Sandage transported Sims to the hospital where he underwent blood testing[2] and an examination by Dr. Mark Tilyou. After the examination, including the neurological testing and the CAT scan, came back normal, Dr. Tilyou released Sims from the hospital. Sandage transported Sims to the Amite jail where he was charged with battery on a police officer, resisting arrest, improper lane usage, and driving while intoxicated. Sims entered a plea of no contest to the DWI charge, and was acquitted on the three other charges.
In addition to this factual testimony, there were two expert witnesses who testified at trial about the bloodstains on Sims' clothes. Ronald Singer, an expert in crime scene analysis and bloodstain pattern analysis, testified on behalf of plaintiffs. Singer was given items to examine, including Sims' clothing, some photographs, and various statements, and was asked specifically to determine which version of events was more consistent with the evidence. He testified that he found spots on the shirt that he considered to be blood although no testing was performed to determine if it actually was blood. On the pants, he noted one small spot that he considered to be blood on the inside of the waistband. Based on the items that he was provided, it was his opinion that the evidence was more consistent with Sims' version of events. He specifically noted the lack of blood on the back of Sims' shirt and pants is inconsistent with Ward's statement that their hands were covered with blood. Singer said that while there are bloodstains on the back of the shirt, they are not in a location nor in the quantity that he would expect to see if the individuals' hands were bloodied to the extent that Ward claimed in his statement. Singer admitted that it was hard to tell how some of the stains got on the shirt, especially in light of the fact that Sims was transported with the shirt still on; however, it is the lack of blood in some areas that concerns him.
In contrast to this expert, the defense called Tom Bevel, who was accepted as an expert in the field of bloodstain pattern analysis. He likewise examined Sims' clothing in order to give his opinion as to what version of events was most likely with regard to the physical evidence. He admitted that he did not test the clothing to determine whether the stains were in fact human blood. After examining the clothes with the unaided eye and then with magnification and cross lighting, he found areas on both the pants and shirt that had the correct color and consistency that he would expect blood to have. With regard to the handcuffs being removed, Bevel acknowledged *709 that it greatly broadened the opportunity for blood to be transferred. He believed that the majority of blood on Sims' hands, especially at the hospital, came from his hands touching various places on his face. In his testimony, he admitted that there were places in both statements that were consistent with the physical evidence. However, in his opinion, the physical evidence was more consistent with the trooper's version of events. With regard to one area, however, he felt that the trooper was mistaken as to the volume of blood that was on Sims' hands and his hands. He pointed to the fact that there were no blood drips on the back of the shirt or pants, leading him to conclude that there was not a great volume of blood.
In challenging the jury verdict, plaintiffs contend that while there are two versions of the incident, the evidence presented only reasonably supports Sims' version. Plaintiffs spend a large portion of this assignment discussing prejudicial remarks and improper arguments by defense counsel. Specifically, plaintiffs assert that defense counsel presented Sims as a rich, successful, lying, vengeful personal injury trial lawyer who knew how to fabricate claims in lawsuits in order to get a big award that the jurors/taxpayers would have to pay. In addition to sending out this message that personal injury trial lawyers are not entitled to receive money, defense counsel also appealed to the jurors to cure the social ill of drinking and driving. According to plaintiffs, these extensive prejudicial remarks were meant to distract the jury from the fact that there was absolutely no evidence supporting the trooper's version of events.
We first note that plaintiffs did not object to most of the complained of remarks. Failure to object constitutes a waiver of the right to complain regarding the argument on appeal. Cooper v. United Southern Assurance Co., 97-0250 (La.App. 1 Cir. 9/9/98), 718 So.2d 1029, 1038. Moreover, the allegedly objectionable statements were subject to corrective measures. The court instructed the jury prior to opening statements as follows: ". . . the arguments which will be addressed to you by the attorneys in this case, are not evidence. Your determination of the facts, must be based solely upon all the testimony that you hear and the other evidence that is submitted." Also, after closing arguments, the judge instructed the jury that the arguments of counsel were not evidence. The court further informed the jurors that they must deliberate without regard to sympathy, prejudice, or passion for or against any party. The judge stated, "The case should be considered and decided as an action between persons of equal standing in the community. The State Police is entitled to the same fair trial at your hands as a private individual. All persons stand equal before the law, and are to be dealt with as equals in a court of justice." These instructions given by the trial judge served to counteract any possible adverse effects of defense counsel's arguments. Given these circumstances, we do not find that the jury was unduly prejudiced by defense counsel's comments.
As part of their challenge to the jury verdict, plaintiffs also point to the lack of evidence to support Ward's version of events. In one of their arguments, plaintiffs allege that the photographs taken of Sims the day after the incident demonstrate the complete lack of injuries to Sims' arms. Thus, these photographs contradict Ward's version that as he and Sims were struggling, they were skidding across the parking lot with Sims' arms underneath his body. We note that while the photographs certainly do not show extensive injuries to Sims' arms, they do *710 reflect some scratches. Also, the severity of the scratches would depend on the position of Sims' arms as they were struggling.
Plaintiffs also point to the complete lack of blood on Sims' clothing. They claim that this absence of blood corroborates Sims' version that he was handcuffed before he received any injuries and contradicts Ward's claim that both of their arms and hands were covered with blood at the time he placed the cuffs on Sims. Once again, conflicting evidence was presented on this issue. Plaintiffs' expert, Ronald Singer, testified that while there were bloodstains on the back of the shirt, they were not in the location nor in the quantity that he would expect to find if the individuals' hands were covered in blood. Singer testified that the lack of blood on some areas of the shirt led him to believe the version of events as told by Sims. In contrast, defendants' expert, Tom Bevel, testified that the physical evidence was more consistent with the trooper's version of events. Bevel testified that he felt the trooper was mistaken as to the volume of blood on their hands. He pointed to the fact that there were no blood drips on the back of the shirt or pants, leading him to conclude that there was not a great volume of blood. Also, there was testimony at trial which indicated that the amount of blood on a person's clothing would depend on how that person was actually handcuffed.
Plaintiffs also point to Maurice Effler's testimony to support their version of events. At trial, Effler, a passerby, testified that on June 3, 2000, he passed Delatte's Grocery Store on his way home from a function in the Superdome. As he was coming upon the store, he saw police lights and thought that there might have been a robbery. He slowed down and saw a state trooper standing over a man lying flat on the ground on his stomach. Effler did not recall whether or not the trooper had any part of his body on the man on the ground. He testified that he did not see a struggle going on and that it looked like the trooper had the situation under control, so he just passed and continued on home. Plaintiffs claim that Effler's testimony contradicts Ward's story that he was on his knees the whole time. However, in contrast to this testimony, Bryant testified that when he arrived on the scene, Ward was stooped next to an individual lying on the ground.
We note that in addition to the inconsistent testimony specifically mentioned above, the jury was presented with conflicting testimony throughout the entire trial. Two very different versions of events with many inconsistencies were presented to the jury. We do not agree with plaintiffs' argument that there was no reasonable evidence which supported Ward's story. There was some evidence which supported Sims' version, and there was some evidence that supported Ward's version. The jury obviously chose to give more credibility to the evidence which supported the trooper's version.
We have thoroughly reviewed the testimony of all the witnesses as well as all of the evidence presented at trial, even if we failed to mention it herein. We have also carefully reviewed all of the arguments presented by plaintiffs regarding the lack of evidence to support Ward's version of events. Based on our review of the entire record, we are not prepared to say that the jury's findings were clearly wrong or manifestly erroneous. Thus, the arguments raised by plaintiffs in this specification of error are without merit.

SPECIFICATION OF ERROR NUMBER TWO
In their second alleged error, plaintiffs assert that the trial court erred in granting *711 defendants' motion in limine to exclude the testimony of an expert witness. In their pretrial order, plaintiffs noticed their intent to call two expert witnesses, Stuart James and Ronald Singer, both of whom were to testify regarding blood spatter analysis, including injury/wound pattern analysis. On March 24, 2004, defendants filed a motion in limine seeking to "exclude or in the alternative limit, cumulative, prejudicial, and excessive expert testimony regarding blood spatter analysis and injury/wound pattern analysis . . . and further to exclude the use of the clothing examined by the experts as not properly authenticated with no viable chain of custody." After a hearing, the court granted the motion in limine limiting plaintiff to one expert instead of two.
Plaintiffs now contend that they were prejudiced by this ruling. They contend that the state purposely sought to eliminate this testimony, not because it was cumulative, but rather because defense counsel did not want to draw attention to the reconstruction testimony that would support Sims' version of events. Plaintiffs contend that this additional expert was made more essential because the defendants intentionally and improperly objected, in front of the jury, to the use of notes by plaintiffs' expert, Ronald Singer. Even though the judge ruled that an expert could certainly refer to his notes in his testimony, plaintiffs assert that the jury was improperly poisoned with the belief that if he had to use notes, they should not believe his testimony. The use of an additional expert would have overcome the suggestion that the only expert to testify had to refer to his notes.
The trial judge has discretion in conducting a trial. The judge is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631. The judge's discretion includes the order of presentation of witnesses as well as the admissibility of a witness's testimony. The trial judge has great discretion in the manner in which the proceedings are conducted before this court, and it is only upon a showing of gross abuse of discretion that appellate courts have intervened. Pino v. Gauthier, 633 So.2d 638, 648 (La.App. 1 Cir.1993), writs denied, 94-0243 (La.3/18/94), 634 So.2d 858 and 94-0260 (La.3/18/94), 634 So.2d 859.
According to LSA-C.E. art. 403, relevant evidence may be "excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." Testimony by experts is governed by LSA-C.E. art. 702 which states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Comment (d) to LSA-C.E. art. 702 explains, "[b]road discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert." Additionally, the trial judge's much discretion will not be disturbed on appeal absent manifest error. Pino v. Gauthier, 633 So.2d at 650.
In the present case, we find no error in the trial court's granting of defendants' motion in limine to exclude one of the experts. First, all of the pretrial information indicated that the two experts were similarly qualified and would testify about the same thing. Moreover, the judge allowed the plaintiffs to select which expert *712 they wanted to testify. Given these circumstances, we find no merit to the arguments raised by plaintiffs in this specified error.
For the reasons set forth herein, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] At trial, several law enforcement personnel testified that the arm bar takedown is a legitimately used and recognized technique to gain control of an uncooperative arrestee. It was described as a fairly violent maneuver which can result in injuries to the face and forehead if the individual hits the ground face first.
[2] Sims underwent two blood alcohol tests at the hospital. One blood test showed a blood alcohol level of .14, and the other showed a level of .137.