MARCOS MASARIEGOS
v.
JOE ALMOND MORGAN, M.D.
MARCOS MASARIEGOS
v.
THE LOUSIANA PATIENTS' COMPENSATION FUND OVERSIGHT BOARD.
No. 2008 CA 0605, Consolidated With No. 2008 CA 0606.
Court of Appeals of Louisiana, First Circuit.
February 13, 2009.
Not Designated for Publication
JOSEPH S. PIACUN, THOMAS A. GENNUSA, II, Metairie, Louisiana and JOSEPH J. McKERNAN, Counsel for Plaintiff/Appellee Marcos Masariegos.
KIRK P. GROH, Counsel for Defendant/Appellant, Louisiana Patients' Compensation Fund Oversight Board.
Before: PARRO, McCLENDON, and WELCH, JJ.
McCLENDON, J.
In this medical malpractice action, the Louisiana Patients' Compensation Fund Oversight Board (PCF) appeals a judgment notwithstanding the verdict finding no comparative fault and a judgment awarding the plaintiff, Marcos Masariegos, special damages and excess general damages sustained as a result of a physician's failure to obtain informed consent. For the reasons that follow, we affirm the former judgment, and we vacate in part, amend in part, and, as amended, affirm in part the latter judgment.

FACTS AND PROCEDURAL HISTORY
On January 18, 1996, forty-seven-year-old Mr, Masariegos was employed by National Pallet Company (National Pallet) in Hammond, Louisiana. While operating a table-mounted radial saw, Mr. Masariegos bent over to reach for a hammer and accidentally severed his left thumb and index finger and injured his left middle finger. Mr. Masariegos and his severed digits were transported to the emergency room at North Oaks Regional Medical Center (North Oaks). Because Mr. Masariegos, a native of Mexico, spoke almost no English,[1] his employer contacted Mr. Masariegos' pastor, Rev. Renato Gongora, who was fluent in English and Spanish, and asked him to go to the hospital to serve as translator for Mr. Masariegos. Mr. Masariegos expressed his desire to have his finger and thumb reattached, but since North Oaks did not have the medical capability to do so, Mr. Masariegos was referred to a hand specialist, Dr. Joe A. Morgan, in Baton Rouge. Thereafter, Mr. Masariegos was taken by ambulance, along with Rev. Gongora, to Baton Rouge Ambulatory Surgical Services (BRASS).[2] The severed digits were wrapped and preserved in a saline solution and sent with Mr. Masariegos in the ambulance. At BRASS, the staff presented a consent form to Mr. Masariegos for the "repair" of his hand, which he signed.
Dr. Morgan performed the repair surgery of the left hand by trimming the remaining bone in Mr. Masariegos' thumb and index finger and cauterizing the nerves and blood vessels. Dr. Morgan also attempted to repair the middle finger by suturing the wound. Post-surgery, Mr. Masariegos surprisingly learned that his digits had not been reattached. Once sufficiently recovered from the surgery, Rev. Gongora and his wife began to drive Mr. Masariegos back to Hammond. On the way, they received a call from Mr. Masariegos' employer, who informed them that he had located Dr. John Dean, a specialist in Baton Rouge, who could reattach the digits. Therefore, they returned to Baton Rouge.
Prior to Mr. Masariegos' arrival, Dr. Dean called Dr. Morgan. During his conversation with Dr. Morgan, Dr. Dean learned that reattachment of the digits was most likely not possible because of the previous surgery performed by Dr. Morgan. When Mr. Masariegos arrived, Dr. Dean examined the wound and confirmed that he could not replant the digits because of the bone amputation and cauterization. However, Dr. Dean performed a second surgery on Mr. Masariegos that day to repair the middle finger, using nerve and tendon tissue from the severed index finger, and to repair the wound closure.
Thereafter, in an attempt to restore some thumb function, Dr. Dean recommended that Mr. Masariegos have one of his toes surgically transplanted to his left thumb post. On May 15, 1996, Mr. Masariegos underwent toe transplant surgery in a ten and one-half (10 1/2) hour operation. Mr. Masariegos' second toe on his left foot was removed and replanted to his left thumb post. Skin was also taken from his thigh to graft to the hand wound. Mr. Masariegos' hand healed well, but his foot healed poorly. After six weeks, Mr. Masariegos was admitted to the hospital with an infection in his big toe, which was amputated on July 2, 1996. Additional surgeries were necessary for debridement of the wound and for skin grafts.
Subsequently, Mr. Masariegos filed a medical malpractice claim against Dr. Morgan. Following the conclusion of the medical review panel, Mr. Masariegos filed a petition for damages against Dr. Morgan on January 26, 2000, alleging that Dr. Morgan failed to obtain informed consent from Mr. Masariegos, failed to disclose to Mr. Masariegos that the facility where Dr. Morgan was operating did not possess the required equipment to perform microsurgical reattachment of his thumb and index finger, and failed to refer Mr. Masariegos to a surgeon and facility where microsurgical reattachment could be performed.[3] On March 23, 2005, the trial court approved a partial settlement of the medical malpractice claim for the statutory maximum payment of $100,000.00 by Dr. Morgan, which constituted an admission of liability pursuant to LSA-R.S. 40:1299.44(CX5)(e), and reserved Mr. Masariegos' right to proceed for excess damages against the PCF.[4]
Following a four-day trial, the jury determined that Mr. Masariegos suffered total damages in the amount of $665,000.00, but attributed sixty percent of the fault to Mr. Masariegos and/or third parties, thereby reducing the damage award to $266,000.00. Upon application of the $100,000.00 credit previously paid by Dr. Morgan in settlement, judgment against the PCF was signed on May 2, 2007, awarding Mr. Masariegos $166,000.00 in damages, together with legal interest from the filing of the request for a medical review panel until paid, and for costs.
Thereafter, both parties filed motions for a judgment notwithstanding the verdict (JNOV). Mr. Masariegos challenged the jury's assessment of comparative fault, whereas the PCF challenged the jury's determination of damages. Following a hearing, the trial court denied the PCF's motion, but granted the motion of Mr. Masariegos and reduced the assignment of comparative fault to him or third parties to zero. Judgment was signed on August 31, 2007. This appeal followed.

DISCUSSION
On appeal, the PCF assigns the following as error:
1. The trial court abused its discretion in denying the PCF's motion for directed verdict on the issue of lost wages.
2. The jury abused its discretion in its award of special damages and general damages.
3. The trial court erred in granting Mr. Masariegos' motion for JNOV and reducing the assignment of comparative fault to zero percent.
4. The trial court erred in denying the PCF's request to present surveillance video and the testimony of the investigator that observed Mr. Masariegos work for an extensive period of time.

The JNOV
We first examine the trial court's granting of the JNOV on the issue of liability. Louisiana Code of Civil Procedure article 1811 provides the procedural guidelines and authority for a JNOV. This article provides that a JNOV may be granted on the issue of liability or on the issue of damages or on both issues. A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Davis v. Wal-Mart Stores, Inc., 00-0445, p. 4 (La. 11/28/00), 774 So.2d 84, 89. The strict criteria for granting a JNOV is predicated on the rule that when there is a jury, the jury is the trier of fact. Smith v. State, Dept. of Transp. & Dev., 04-1317, 04-1594, pp. 12-13 (La. 3/11/05), 899 So.2d 516, 525.
The standard of review for a JNOV on appeal is a two part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review. Davis, 00-0445 at p. 5, 774 So.2d at 89.
In this appeal, the PCF avers that the trial court erred in granting Mr. Masariegos' motion for a JNOV and in reducing the assignment of comparative fault to zero. The PCF argues that considering the evidence presented at trial, reasonable persons could differ as to the comparative fault of persons other than Dr. Morgan and therefore the jury had a reasonable basis upon which to determine comparative fault in the amount of sixty percent. Specifically, the PCF contends that Mr. Masariegos' diabetes and his failure to disclose his diabetes to Dr. Dean caused or contributed to his damages, particularly the loss of his big toe. The PCF notes that the admission forms at North Oaks and BRASS indicate that Mr. Masariegos knew he had diabetes. The PCF also contends that an automobile accident in September 1996 could have contributed to Mr. Masariegos' injuries.
At trial, Mr. Masariegos testified through an interpreter. He testified that he was born in Mexico, where he had one year of education at the age of twelve. He has a permanent resident card for the United States. He stated that after he severed his digits, he brought them to North Oaks because he wanted them reattached. Mr. Masariegos thought his transfer from North Oaks to BRASS in Baton Rouge was for that purpose. Mr. Masariegos admitted that he knew he had diabetes before his work accident.
Rev. Gongora testified that he and Mr. Masariegos arrived at BRASS before Dr. Morgan. He stated that when the doctor finally arrived, he told Dr. Morgan that they had the digits. The surgery was over quickly, and when he was told by Dr. Morgan what was done, Rev. Gongora did not understand what happened. He had to tell Mr. Masariegos what took place and Mr. Masariegos cried. Mr. Masariegos cried again after Dr. Dean's surgery when Rev. Gongora told him that his digits could not be reattached.
Dr. Morgan admitted at trial that he did not tell Mr. Masariegos what his options were and only told him what he did and asked whether Mr. Masariegos wanted it done. Dr. Morgan also conceded that he never told Mr. Masariegos that he could go elsewhere for reimplantation, although he knew his severed digits had been wrapped and preserved in saline.
Dr. Dean, who was qualified as an expert in general surgery, plastic surgery, and microvascular reconstructive hand surgery, testified that after speaking to Dr. Morgan, he realized that he could not do a replant. The blood vessels had been cauterized destroying the blood supply. Dr. Dean stated that Mr. Masariegos still needed surgery that day because the nerve injury to the third finger had not been repaired and the wound simply had been closed with sutures by Dr. Morgan. Dr. Dean stated he therefore used a piece of nerve graft and tendon from the severed index finger to repair the middle finger. Dr. Dean testified that his repair of the third finger resulted in approximately the same impairment irrespective of Dr. Morgan's involvement. He also stated that it would have been a mistake to try to replace the index finger because it would have been stiff and gotten in Mr. Masariegos' way. Dr. Dean testified that if Mr. Masariegos had initially gone to him, he would have taken the index finger and moved it to the thumb position and disposed of the thumb. That way, Mr. Masariegos would have something to use to pinch. The index finger was long enough, would work, and would have been easier to use because of the extra length. He stated his chances of success would have been more than eighty percent, and Mr. Masariegos would have had a stable thumb with feeling and movement. Although the index finger at the thumb position may have healed a little faster than the second toe, Dr. Dean stated the thumb would have had about the same impairment, either way. Thus, according to Dr. Dean, Mr. Masariegos' upper extremity impairment would have been about the same, whether Dr. Morgan was involved or not.
Dr. Dean discussed with Mr. Masariegos the possibility of surgery in the future to get a thumb post of some sort to oppose against, but stated that Mr. Masariegos' injury first needed to heal. According to Dr. Dean, Mr. Masariegos' middle finger was a big issue, because it was stiff and required therapy before Mr. Masariegos' thumb could be rebuilt.
On May 15, 1996, Mr. Masariegos' second toe on his left foot was harvested in a ten and one-half hour operation by Dr. Dean with another team of doctors. The second team harvested the toe, and Dr. Dean performed the reattachment to the thumb post. Although Mr. Masariegos' sugar was elevated, Dr. Dean testified that it was not a problem and did not preclude the surgery.
Dr. Dean testified that Mr. Masariegos progressed fairly well after the surgery, and his hand, in fact, did wonderfully. He stated, however, that Mr, Masariegos' foot gave him more problems and hurt worse than his hand. Part of the problem was that the bone in his foot needed to be stabilized because of the missing toe and therefore a temporary pin was inserted. The pin was removed after about six weeks. However, approximately two weeks after that, Mr. Masariegos was admitted to the hospital because of an infection in the end of his big toe. The toe developed gangrene, and Dr. Dean performed surgery to debride the wound. Nonetheless, the infection was extensive enough to require the amputation of the big toe on July 2, 1996. Surgery was also performed on July 5, 1996, and again on July 7, 1996, to debride the wound. Each time, Mr. Masariegos was given general anesthesia. Skin grafts from his thigh were also taken on two occasions to close his wounds.
On cross examination, Dr. Dean acknowledged that Mr. Masariegos' diabetes was a factor, among others, which contributed to the problems with his big toe. The pin, the blood supply to the foot, and the infection itself were all contributing factors. Although not a false issue, Dr. Dean testified that even if he had known of the diabetes before the surgery, he still would have performed the toe-to-hand transfer.
Dr. Dean opined that if he had been able to initially perform surgery and put Mr. Masariegos' index finger on his thumb post, the foot surgeries would not have been necessary. He also believed that Mr. Masariegos' medical expenses were a necessary result of the surgery by Dr. Morgan, which expenses included the subsequent surgeries, home health care, wheelchair, crutches, pain medications, and vocational rehabilitation on the foot.
With regard to an automobile accident in September 1996, Dr. Dean testified that he did not think the accident caused any further injuries to Mr. Masariegos' foot and had nothing to do with his foot. Dr. Dean last saw Mr. Masariegos on August 28, 1997. At that time, Mr. Masariegos's major problem was with pain. Dr. Dean concluded that Mr. Masariegos had an anatomical impairment rating of forty percent of the whole body, which was comprised of seven percent from the foot and thirty-four percent from the hand.
Following deliberations, the jury returned its verdict, determining that Dr. Morgan caused Mr. Masariegos to incur damages and that sixty percent of the fault that caused or contributed to the damages was attributed to plaintiff or third parties. The jury awarded $130,000.00 for past medical expenses, $150,000.00 for physical pain and suffering, $150,000.00 for mental pain and suffering, $150,000.00 for lost wages, zero for permanent disability, and $85,000.00 for permanent scarring and disfigurement, for a total of $665,000.00.
The PCF bore the burden of proving comparative negligence by a preponderance of the evidence. See Bergeron v. K-Mart Corporation, 540 So.2d 406, 408 (La.App. 1 Cir.), writs denied, 544 So.2d 408, 412 (La. 1989). The PCF failed to meet that burden. The evidence was simply insufficient for a jury to determine that Mr. Masariegos or anyone else caused or contributed to Mr. Masariegos' damages that were caused by Dr. Morgan. Dr. Dean testified that even if he had known about Mr. Masariegos' diabetes, he still would have performed the surgery. Similarly, Dr. Dean was the only physician to testify regarding the car accident in September 1996, and he stated that the accident in no way complicated or contributed to Mr. Masariegos' medical condition. While we recognize that Mr. Masariegos' on-the-job accident began the series of events that forms the basis of this litigation, this case is about damages resulting from medical malpractice after Mr. Masariegos injured his hand. Dr. Morgan has admitted liability. No evidence of any fault other than that of Dr. Morgan after the initial injury occurred was presented. Thus, after reviewing the record, we agree that no reasonable juror could have found Mr. Masariegos or others to be sixty percent at fault relative to the damages caused by the negligence of Dr. Morgan. Therefore, we find no manifest error in the trial court's reduction of comparative fault to zero percent, thereby assigning one hundred percent of the fault at issue in this case to Dr. Morgan.

The Motion for Directed Verdict and Lost Wages
At the conclusion of Mr. Masariegos' case-in-chief, the PCF moved for a directed verdict on the issue of lost wages, asserting that Mr. Masariegos failed to establish that any lost wages were the result of Dr. Morgan's actions. The trial court denied the PCF's motion, which the PCF urges was error. The PCF also asserts that the jury erred in awarding any special damages for lost wages. Mr. Masariegos contends, however, that he presented substantial and satisfactory evidence that he suffered significant lost wages because of Dr. Morgan's admitted malpractice and that the jury had a reasonable factual basis to support its $150,000.00 award for past and future lost wages.
A motion for a directed verdict is authorized by LSA-C.C.P. art. 1810 and provides that such a motion must be made at the close of the evidence offered by the moving party's opponent. A trial judge has much discretion in determining whether to grant a motion for directed verdict. Generally, a motion for directed verdict is appropriately granted when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. Rabalais v. St. Tammany Parish School Bd., 06-0045, 06-0046, p. 6 (La.App. 1 Cir. 11/3/06), 950 So.2d 765, 769, writ denied. 06-2821 (La. 1/26/07), 948 So.2d 177. On appeal, the standard of review for legal sufficiency of the evidence challenges, such as those presented by motions for directed verdicts, is de novo. Rabalais, 06-0045, 06-0046 at p. 7, 950 So.2d at 770.
Mr. Masariegos testified that he has constant pain in his hand and foot and cannot do heavy work. He stated that following his surgeries he underwent a work hardening program and tried returning to work at National Pallet, but after a couple of hours, the pain in his leg, foot, and hand was too bad. He has not had a full-time job since his accident. Mr. Masariegos acknowledged that since 2004 he has done some seasonal part-time work for one person, which includes mowing grass, cleaning houses, and burning trash. He estimated that he has earned between $2,500.00 and $3,000.00 annually. Mr. Masariegos further stated that he worked because his wife was ill and he needed the money, although his hand and foot hurt while he did so.
Mr. Masariegos also presented the expert testimony of Bobby Roberts, a vocational evaluator, and Dr. Pat Culbertson, an economist, to establish his claim for lost wages. Mr. Roberts testified that he met with Mr. Masariegos on August 15, 2005, for an evaluation for purposes of reemployment. Initially, he obtained Mr. Masariegos' educational background and work history. Mr. Masariegos had only one year of education in Mexico. Mr. Masariegos' work history in the United States consisted of medium to heavy work, mostly unskilled work, with some semiskilled capabilities, all requiring him to be on his feet extensively. Mr. Roberts went through Mr. Masariegos' history of medical treatment and stated that Mr. Masariegos was still having pain in his hand and foot. Mr. Roberts testified that Mr. Masariegos looks pretty good walking but that he has a lot of pain while doing so. Mr. Roberts stated that he then tested Mr. Masariegos academically and that he tested just below the kindergarten level. Mr. Roberts followed with functional testing and concluded that Mr. Masariegos had no functional use of his left thumb. Mr. Masariegos attempted everything that was asked of him, even those things Mr. Roberts knew would hurt him.
According to Mr. Roberts, Mr. Masariegos had a nonexistent prognosis for getting back to where he could functionally perform competitively. Based on an industrial engineering score between zero and 150, where 100 is considered competitive entry for full-time work, Mr. Masariegos scored an average of 12.5. Mr. Roberts explained that Mr. Masariegos could do things, but not on a competitive basis five days a week for thirty-six or more hours a week. However, Mr. Roberts also stated that he was not really able to test Mr. Masariegos' standing ability, since most of the tests were performed while Mr. Masariegos was sitting, as he was testing light work samples. Mr. Roberts then discussed the problems with Mr. Masariegos' foot. Any jobs that he would qualify for would require extensive standing, walking, bending, stooping, and squatting. Mr. Masariegos would be in pain, plus there was muscle cramping. Nor, based on his testing, did Mr. Roberts think Mr. Masariegos could engage in part-time employment of about twenty hours a week consistently. He was not surprised to discover that Mr. Masariegos had tried to do some part-time work, such as lawn cutting and pruning. However, he could not see that it would be anywhere near a competitive level, nor would Mr. Masariegos be able to sustain such a job over time.
On cross examination, Mr. Roberts read from the report he prepared,[5] which concluded:
This gentleman is obviously not employable in any capacity. He has no transferable work skills. He is functionally illiterate. He has relied on his physical capabilities to work in the past to at least a semiskilled level. His wage loss would be considered total from the date of injury through whatever would be considered normal retirement in his case. He had earning capabilities at least in the seven to eight dollar per hour range. Those were removed at the time of his amputation of the left thumb and index finger. He basically functions as a one-armed individual with functional illiteracy, and being limited only to the use of his right dominant hand, he would not be considered employable in any capacity. His vocational prognosis for ever returning to work is nonexistent. His wage loss should be calculated from the date of injury through normal retirement.
After being shown portions of a video tape, wherein Mr. Masariegos was doing some lawn work and sharpening a knife, Mr. Roberts did not find Mr. Masariegos' activities in the tape inconsistent with his findings. Mr. Roberts stated he was testing functionality on a competitive level.
Dr. Culbertson, Mr. Masariegos' expert economist, testified that he reviewed Mr. Roberts' report and, based on that information combined with his calculations, determined that Mr. Masariegos suffered past and future lost wages in the amount of $197,486.00. Factoring in Mr. Masariegos' part-time work starting in 2004 of about $3,000.00 per year, Dr. Culbertson reduced that amount to $188,486.00.
Viewing the evidence in the light most favorable to Mr. Masariegos, we cannot say that the trial court abused its discretion in denying the PCF's motion for a directed verdict. However, we find that the jury was manifestly erroneous in its award of $150,000.00 for past and future lost wages.
Special damages are those which have a "ready market value," such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages. Kaiser v. Hardin, 06-2092, p. 11 (La. 4/11/07), 953 So.2d 802, 810. A plaintiff is required to prove special damages by a preponderance of the evidence, and the findings of the trier of fact are subject to the manifest error standard of review. Fleniken v. Entergy Corporation, 00-1824, 00-1825, p. 29 (La.App. 1 Cir. 2/16/01), 780 So.2d 1175, 1195, writs denied. 01-1268, 01-1305, 01-1317 (La. 6/15/01), 793 So.2d 1250, 1253, and 1254.
In this matter, Mr. Roberts testified that Mr. Masariegos became unemployable when he amputated his fingers. This testimony was uncontroverted. There is nothing in the record indicating that implantation at the thumb post of the index finger rather than the second toe would have changed that functional capacity.[6] Thus, had Mr. Masariegos never seen Dr. Morgan and gone right to Dr. Dean, his employment capacity would have remained the same and Mr. Masariegos' inability to work would still exist. Further, even if his foot problems may have contributed to his inability to work, the evidence presented by Mr. Masariegos indicates that his inability to work existed despite any actions by Dr. Morgan. Thus, finding no reasonable factual basis for a lost wages award, we vacate that portion of the judgment awarding Mr. Masariegos $150,000.00 in lost wages.

Medical Expenses and General Damages
The PCF further asserts that the jury abused its discretion in its award of general damages and special damages for medical expenses. Mr. Masariegos contends that the jury awards are clearly supported by the evidence.
With regard to medical expenses, when claims for accrued medical expenses are supported by medical bills, these expenses should be awarded unless there is contradictory evidence or reasonable suspicion that the bills are unrelated to the accident. Mack v. Wiley, 07-2344, p. 14 (La.App. 1 Cir. 5/2/08), 991 So.2d 479, 489, writ denied, 08-1181 (La. 9/19/08), 992 So.2d 932.
Dr. Dean testified that once Dr. Morgan performed his services, all of Mr. Masariegos' subsequent surgeries were necessary. Dr. Dean testified that if Dr. Morgan had not performed surgery on Mr. Masariegos and if he had been able to operate initially, the three debridements, the two skin grafts, and the two toe amputations would not have occurred.
Mr. Masariegos submitted medical bills totaling $128,838.00 without objection.[7] Reviewing the medical records, we note that Mr. Masariegos' physical therapy from February 6, 1996, through March 18, 1996, totaling $3,290.85, was for his hand, as he had not yet had his toe-to-hand transplant. Mr. Masariegos has conceded that some of the medical expenses were "not 100% related e.g. P/T to 3rd finger." Dr. Dean testified that physical therapy was required for the third finger before further surgery could be considered for Mr. Masariegos. This therapy would have been required regardless of any procedures by Dr. Morgan, and we therefore deduct $3,290.85 from the submitted medical expense amount of $128,838.00. Additionally, we subtract $410.00 for the paraffin bath charges for Mr. Masariegos' hand, which Mr. Masariegos acknowledged was unrelated to Dr. Morgan's actions. Because the PCF has admitted that it has not separated any of the other medical charges between the foot and the hand, we are unable to do so, and we amend the medical expenses award to Mr. Masariegos to $125,137.15, based on the record before us.
General damages are those which may not be fixed with any degree of pecuniary exactitude, but which instead involve mental or physical pain or suffering, inconvenience, the loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle, which cannot really be measured definitively in terms of money. McGee v. A C and S, Inc., 05-1036, pp. 3-4 (La. 7/10/06), 933 So.2d 770, 774. The primary objective of general damages is to restore the injured party in as near a fashion as possible to the state he or she was in at the time immediately preceding injury. Factors to be considered in assessing quantum for pain and suffering are the severity and duration thereof. Turner v. Ostrowe, 01-1935, pp. 15-16 (La.App. 1 Cir. 9/27/02), 828 So.2d 1212,1224, writ denied. 02-2940 (La. 2/7/03), 836 So.2d 107.
Furthermore, it is well settled in our jurisprudence that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Wainwright v. Fontenot, 00-0492, p. 5 (La. 10/17/00), 774 So.2d 70, 74. Where a defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of his aggravation. American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La. 1991).
Our jurisprudence has consistently held that in the assessment of general damages, much discretion is left to the jury, and upon appellate review such awards will be disturbed only when there has been a clear abuse of that discretion. See Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La. 1976). The discretion vested in the jury is great, even "vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied. 510 U.S. 1114, 114 S.Ct. 1059, 127 LEd.2d 379 (1994).
The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Wainwright, 00-0492 at p. 6, 774 So.2d at 74; Youn, 623 So.2d at 1261. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. Youn, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Id.
In the case sub judice, the jury made a total general damage award in the amount of $385,000.00 ($150,000.00 for physical pain and suffering, $150,000.00 for mental pain and suffering, and $85,000.00 for permanent scarring and disfigurement). Due to Dr. Morgan's involvement in this matter, Mr. Masariegos was required to undergo numerous surgical procedures under general anesthesia. Not only was Mr. Masariegos' second toe removed for use as a replacement thumb, but he also lost his big toe due to an infection. Dr. Dean stated that none of this would have happened if he had originally been able to reattach Mr. Masariegos' index finger to his thumb post. There would have been no involvement of his foot, and the skin graft and debridement procedures would not have been necessary, which also required general anesthesia. Further, Mr. Masariegos continues to suffer with significant pain in his leg and foot. While the award appears to be high, given the numerous surgical procedures undergone by Mr. Masariegos and the disfigurement and impairment of his foot, we cannot conclude that said award is abusively high or that it is an abuse of the trier of fact's vast discretion. Thus, we affirm the general damages award of $385,000.00.

Surveillance Evidence
In its last assignment of error, the PCF contends that the trial court erred in denying its request to present a surveillance video and the testimony of the investigator who observed Mr. Masariegos working. Mr. Masariegos argues that the trial court was within its broad discretion in limiting the surveillance evidence that was presented to the jury.
A trial court has discretion in conducting a trial in an orderly, expeditious manner and in controlling the proceedings so that justice is done. See LSA-C.C.P. art. 1631. This discretion includes the admissibility of a witness's testimony. Sims v. Ward, 05-0278, p. 16 (La.App. 1 Cir. 6/9/06), 938 So.2d 702, 711, writ denied. 06-2104 (La. 11/17/06), 942 So.2d 535. The trial court is also vested with broad discretion as to whether motion pictures or videotapes are admissible. Olivier v. LeJeune, 95-0053, p. 10 (La. 2/28/96), 668 So.2d 347, 351.
In the case before us, the trial court viewed the surveillance tape out of the presence of the jury. The PCF argues that the tape shows Mr. Masariegos performing the type of manual labor the vocational evaluator, Mr. Roberts, testified he was unable to perform. The PCF asserts that the surveillance video and the testimony of the investigator would have aided the jury in determining Mr. Masariegos' credibility and the extent of his damages. While not permitting use of the entire video, the court did allow a portion of it into evidence, showing Mr. Masariegos performing some yard work and sharpening a knife. The jury saw Mr. Masariegos working and was able to draw its own conclusions therefrom. After a review of the record, we conclude that any more evidence on this issue would not have added anything further and would not have affected the outcome. Accordingly, we find no abuse of discretion by the trial court in limiting the surveillance evidence. Therefore, we conclude that this assignment of error is without merit.

CONCLUSION
For the foregoing reasons, we affirm the trial court's judgment of August 31, 2007, which granted Mr. Masariegos' motion for a judgment notwithstanding the verdict and reduced the jury's assignment of comparative fault to him and others to zero. Further, we vacate that portion of the trial court's May 2, 2007 judgment, which awarded Mr. Masariegos $150,000.00 in past and future lost wages. We amend the medical expenses award by reducing the amount to $125,137.15. We affirm the general damages award of $385,000.00. Thus, the total amount of damages awarded to Mr. Masariegos is reduced to $510,137.15, subject to the $100,000.00 credit previously paid by Dr. Morgan, for a reduced total of $410,137.15. In all other respects, the judgment is affirmed. Costs of this appeal in the amount of $4,557.38 shall be shared equally.
AUGUST 31, 2007 JUDGMENT NOTWITHSTANDING THE VERDICT AFFIRMED; MAY 2, 2007 JUDGMENT VACATED IN PART, AMENDED IN PART, AND, AS AMENDED, AFFIRMED IN PART.
NOTES
[1] Mr. Masariegos is a legal resident alien of the United States.
[2] Rev. Gongora's wife followed the ambulance in a van.
[3] National Pallet Company intervened in the proceedings, asserting a lien for reimbursement against any recovery by Mr. Masariegos pursuant to the Louisiana Workers' Compensation Act.
[4] Mr. Masariegos' petition for court approval of the partial settlement also included a petition for excess damages against the PCF. The petition for excess damages was given a new docket number, but the two matters were later consolidated.
[5] The report itself was not introduced into evidence.
[6] We again note that Dr. Dean would have disposed of the thumb and attached Mr. Masariegos' index finger at the thumb post. Dr. Dean testified that the only difference between the use of the index finger, as opposed to the second toe, was that the finger may have healed a little faster.
[7] The jury awarded past medical expenses in the amount of $130,000.00.