723 So.2d 517 (1998)
Leon Craig GILLEY, Plaintiff-Appellant,
v.
WENDY'S, INC., and State Farm Insurance Company, Defendants-Appellees.
No. 31,353-CA.
Court of Appeal of Louisiana, Second Circuit.
December 9, 1998.
*518 Myrt T. Hales, Jr., Rayville, Mack E. Barham, Robert E. Arceneaux, Gail N. Wise, New Orleans, Counsel for Plaintiff-Appellant.
Hudson, Potts & Bernstein, By Gordon L. James, Monroe, Counsel for Defendants-Appellees.
Before MARVIN, C.J., and HIGHTOWER and WILLIAMS, JJ.
MARVIN, C.J.
This appeal by plaintiff arises out of his action for slip and fall damages occurring in 1994 against a Wendy's restaurant in Monroe that was initially tried by a jury whose verdict was assailed as inconsistent by each litigant. Some 3½ months after the trial court granted a new trial in June 1997 on motions of plaintiff and defendants, the litigants stipulated they would waive trial by jury and submit the matter to the court for decision on the record and transcript of proceedings before the jury and on briefs to be filed within 30 days after the testimony had been transcribed, as if the matter "had been retried by the court."
After the court found plaintiff to have been impeached in several areas and unworthy of belief, the court signed a judgment dismissing plaintiff's demands on March 9, 1998.
In the motions for JNOV or new trial, each litigant contended the jury verdict [allocating fault 60 percent to Wendy's and assessing only medical special damages ($17,000) and no general damages] was inconsistent. Plaintiff now contends that the jury's inconsistent verdict was an error of law which could have been corrected by JNOV and that the trial court abused its discretion in granting a new trial. Plaintiff alternatively asserts that the trial court's factual findings after the new trial are clearly wrong.
We affirm.

FACTS
Plaintiff Gilley alleged that he slipped and fell on a recently mopped floor in the restroom of Wendy's restaurant on U.S. Hwy. 165 in Monroe on February 22, 1994. Gilley was on crutches at the time, having broken a bone in his left knee about February 8, 1994, while playing with his girlfriend's dog.
Gilley's family doctor in Mangham referred him to an orthopedic surgeon in Monroe, Dr. Douglas Brown, for treatment of the knee fracture, a comminuted compressed fracture of the lateral tibial plateau. On *519 February 11, 1994, Dr. Brown placed a compression bandage and an immobilizer or brace on the knee to reduce swelling and to restrict movement, instructing Gilley not to bear any weight on the left leg and to return for a follow-up visit in two weeks. Dr. Brown did not recommend surgery initially, explaining that he expected the fracture to heal on its own in about three months with the prescribed conservative treatment. According to Dr. Brown, Gilley was "not supposed to put any weight at all on the [left] leg" because any amount of weight-bearing could aggravate the injury.
Gilley's girlfriend testified that during this period of some two weeks between Gilley's initial injury and the alleged fall at Wendy's, Gilley used his crutches "a good bit" but "not constantly[.] ... Not as much as I wanted him to. He ... tried not to use them but he had to use them."
Gilley claimed he reinjured his left knee in the fall in the Wendy's restroom on February 22, but gave varying accounts of how the second injury occurred. The restroom's tile floor had just been mopped and was still wet, by all accounts. The employee who mopped the floor. Lonnie Cross, had failed to display the store's caution or warning sign, as required by company procedure. Gilley said he "bumped the door open" as he entered the restroom on his crutches, wearing the knee brace on his left knee. On direct examination at trial, Gilley testified:
... I went to put the crutches down to ... grab for the door [to the commode stall]. The floor was wet and the crutches slipped out from under me, you know, not knowing that it was wet.... [T]he [entrance] door [to the restroom] opened inward ... [and] when I fell ... the door closed in behind me....
Q. Did you fall all the way to the floor?
A. Yes, I did.
Q. Did your knee hit the floor?
A. Yes.

(Our emphasis and brackets.)
On cross-examination, Gilley said, "I fell towards my right onto the floor." After affirmatively stating that "both knees hit the floor," Gilley quickly equivocated by explaining, "I'm presuming they both did[.]" Gilley was then asked about the statement he had given to a claims adjuster for Wendy's liability insurer, a co-defendant, shortly after the incident in which he apparently said that his "right knee fell and hit the floor," his "left foot hit [his] right foot" and his left knee "never hit [the ground]." At trial, Gilley said, "I was probably meaning [my left knee] never hit my [right] knee." Our brackets. Gilley's statement to the adjuster was not introduced in evidence.
No one witnessed Gilley's fall. Gilley said he was able to get up by himself, notwithstanding his testimony that the pain in his knee intensified from "minor aches" before the restroom fall to "kind of like a Mack truck hit me ... as soon as I fell."
After exiting the restroom, Gilley told the store's cashier that he had fallen in the restroom and "they needed to have it mopped." The cashier recalled Gilley as having said, "Somebody needs to go in that bathroom because I just slipped and fell on my butt." Our emphasis. Gilley did not tell the cashier he was hurt and did not say he had fallen on his injured knee. He ordered a meal and sat down at a table to eat. Another Wendy's employee, seeing that Gilley was on crutches, carried his tray to the table for him.
The cashier sent Cross back to the restroom to remop the floor. Cross did not find any standing water on the floor but described the floor as "slippery" from the recent mopping. He observed a white "skid mark" on the tan floor in front of the sink, "like ... when you fall down," but the mark was not in the entranceway to the restroom, the area where Gilley claimed to have fallen. Cross estimated the skid mark was between one and three feet long and "pretty wide." Cross remopped the floor and displayed the caution sign.
Gilley testified he ate only "a few bites" of his meal. Before leaving the restaurant, he conversed with another restaurant patron whom he did not know, Eddie Marshall. Gilley told Marshall he had fallen on the wet floor in the restroom and asked Marshall to accompany him to the restroom to look at the floor. Estimating that the two entered the *520 restroom about 15 minutes after he fell, Gilley said he was "shocked" to see that the floor was dry. According to Marshall, however, Gilley knew that a store employee "went in there to mop it" after Gilley reported the fall, telling Marshall the floor under the sink had been wet before. Marshall did not recall Gilley saying he had been injured in the fall or complaining of any pain.
Gilley testified at trial that it was "almost dark" when he arrived at Wendy's on February 22. He said "it had to be around 5:00," more than two hours earlier than his initial estimate of 7:00 or 7:30 p.m. and at least an hour earlier than his later pre-trial estimate of 6:00 or 6:30 p.m. According to Wendy's payroll records, the cashier and Lonnie Cross worked the shift that ended at 5:00 p.m. that day, respectively clocking out at 5:02 and 5:18 p.m. Gilley explained his varying time estimates by saying, "I ... never wear a watch .... I don't keep up with time much."

Medical Treatment
On February 23, 1994, the day after the incident at Wendy's, and after first telephoning his lawyer, Gilley returned to Dr. Brown complaining of increased pain in his left knee. According to Dr. Brown's office notes, Gilley reported that he
was at Wendy's on 165 ... last night .... A crutch went out from under him. He took all of his weight on his left leg, developed increasing pain in his left leg. X-rays today show increased depression of the lateral tibial plateau of the left knee ... farther than the tolerable level.... He is therefore scheduled for surgery ... [to] include left tibial plateau elevation, internal fixation and bone grafting with iliac graft....
(Our emphasis.)
In a March 3,1994 letter to Wendy's liability insurer, State Farm, Dr. Brown opined that "the fall at Wendy's aggravated the pre-existing condition requiring [Gilley] to now undergo corrective surgery on the knee." Dr. Brown said his reference to the fall at Wendy's as the source of the aggravation was based on the history Gilley related. The same type of aggravation could occur with anything that caused the injured leg to bear weight, according to Dr. Brown.
Gilley had surgery on March 10 and recovered well, according to Dr. Brown. Though only 38 years old, Gilley had been unable to work for several years, having suffered a disabling back injury in a 1991 car accident, shortly after he was divorced from the mother of his three daughters. Working primarily in farming and welding before that injury, Gilley now relies on his parents to help support him and his daughters, who live with their mother.
After the knee surgery in March 1994, Gilley did not attend physical therapy as Dr. Brown directed, due to either or both lack of transportation and financial constraints. Without any rehabilitative exercise, his left leg became markedly weaker than his right.
In the fall of 1994, Gilley began having pain in the area of the metal plate that had been inserted in his knee, causing Dr. Brown to recommend that the plate be surgically removed. Gilley had not had the second surgery by the time of trial in June 1997, again explaining that he could not afford it.
Gilley missed several appointments with Dr. Brown from August 1994 through January 1995, but continued to call Dr. Brown's office for refills of his pain medication. Gilley initially explained the missed appointments by saying he was seeing his family doctor in Mangham, Dr. Abraham, instead because those visits cost less than his visits to Dr. Brown. Dr. Abraham's records, however, showed Gilley first visited him in April 1996. Gilley was still seeing Dr. Abraham for pain management and medication at the time of trial.
In pre-trial discovery, Gilley answered interrogatories inquiring about all physicians he had seen in the ten years before the 1994 incident at Wendy's. About two weeks before trial, Gilley supplemented his answers to disclose that he had been treated in the late 1980's by a psychologist, Dr. Weinholt, and an addictionologist, Dr. Elliott, before his divorce and before his 1991 auto accident. Gilley explained the omission at trial: "I guess I forgot them [before].... [T]hey're both bordering on ... a long time ago.... *521 I'm not trying to hide anything." Our brackets.
On August 31, 1995, Dr. Brown noted that Gilley's left leg was stronger and his range of motion was better than it had been. Gilley told Dr. Brown he "had been working all summer ... hoeing cotton." In February 1996, Gilley told Dr. Brown he had been working as a meter reader, a job that required him to do a lot of walking. Dr. Brown found the leg "was improving just through use."
Gilley, on the other hand, testified at trial that the only work he did after the fall at Wendy's was "for Taylor Construction Company... working on the Holidome ... last... fall ... for about a month."
In answers to interrogatories filed before Dr. Brown's deposition was taken, Gilley estimated his general damages from the fall at Wendy's at more than $300,000 and his special damages at about $180,000, including an "estimated $75,000" for future medical expenses. Dr. Brown, however, opined that Gilley's anticipated future surgery would cost $5,000-10,000. At trial, Gilley candidly admitted that his lawyer told him the $75,000 estimate of future medical expenses "would never fly." According to Gilley's attempted explanation: "[I]f you wanted to sell me your car and you wanted say $50.00 for it you're not going to start out at $20.00 and go up to fifty and expect me to buy it.... I'm talking highest [numbers] and then maybe try to come down to something [lower.]" Our brackets.

JURY FINDINGS AND POST-TRIAL MOTIONS
The jury answered "Yes" to the first two jury interrogatories:
Did plaintiff prove by a preponderance of the evidence that a hazardous condition on the Wendy's, Inc. premises caused plaintiff's injury?
Did the plaintiff prove by a preponderance of the evidence that Wendy's, Inc. either created the hazardous condition or that Wendy's, Inc. had actual or constructive notice of the condition prior to the accident?
After allocating fault 60 percent to Wendy's and 40 percent to Gilley, the jury awarded Gilley $17,000 in "Medical Expenses" and made no award for "General Damages."
Both Gilley and Wendy's filed a motion for judgment notwithstanding the verdict or alternatively for a new trial. Gilley asserted the verdict was inconsistent in that the jury awarded medical expenses but no general damages. Gilley additionally sought to have the jury's finding of comparative fault modified or set aside.
Wendy's claimed the finding of liability was unsupported by the evidence, arguing that the jury's verdict "was clearly based upon sympathy and not upon any belief that plaintiff was actually injured at Wendy's." In the first paragraph of its memorandum in support of the motion, Wendy's asserted:
... The factual evidence at the scene established that no fall, in fact, occurred. Plaintiff's own testimony was the only testimony to establish the occurrence of a fall, and plaintiff was repeatedly impeached with regard to every aspect of his testimony. As a result, [Wendy's] submits that the jury verdict was simply a sympathy verdict aimed at providing plaintiff with reimbursement of medical expenses, and was not a verdict based reasonably upon the evidence submitted at trial.
After addressing the inconsistencies in Gilley's testimony at length, Wendy's requested a "JNOV on the issue of liability," claiming reasonable jurors could not arrive at a verdict of liability on the evidence before the jury. Alternatively, Wendy's asserted Gilley's testimony "was so unreliable that manifest injustice will occur if the case is not retried."
On June 24, 1997, the trial court granted a new trial "to plaintiff and defendants" on these findings:
The jury found defendant, and thereby its insurer, sixty (60%) percent liable for plaintiff's injuries. However, the jury only awarded medical expenses and no amount of damages for any general damages. Consequently, the jury's verdict is inconsistent. This Court is reluctant to either disregard the findings of a jury [on the *522 issue of liability] or to grant [monetary] relief which a jury, for some reason, did not intend.
(Our emphasis and brackets.)
On October 10, 1997, some 3½ months after the trial court granted a new trial on June 24, 1997, the litigants jointly stipulated that they

have agreed to waive a trial by jury; ... [and] that the testimony from the trial will be transcribed, and ... the parties will have 30 days to submit trial briefs to the court after completion of the transcript, and ... thereafter the matter [will] be submitted for decision by the court as if it had been retried before this court.

(Our emphasis and brackets.)
About two-thirds of Gilley's trial memorandum filed in December 1997 is devoted to the issue of liability, with the remainder addressing damages. The liability discussion addresses both Wendy's post-trial claim that Gilley did not fall as he claimed and Gilley's assertion that he should not be assessed with any fault. Most of Wendy's trial memorandum is also directed at the liability issue, including "whether an accident actually occurred." Gilley's rebuttal memorandum contains no objection or assertion that the latter issue was not properly before the trial court.

JUDGMENT ON RETRIAL
On retrial, the trial court rendered judgment for Wendy's, dismissing the action. The court found Gilley's trial testimony was inconsistent not only with the physical evidence and with the testimony of other witnesses, but also with Gilley's prior statements about the accident. We quote portions of the court's lengthy reasons for judgment:
... Lonnie Cross, the employee of Wendy's who actually mopped the restroom floor, mentioned seeing a wide white mark in front of the sink and in the immediate area of the urinal, but it appears from plaintiff's testimony that this mark, if any, had nothing to do with plaintiff's alleged fall because plaintiff never reached the area where the mark was seen, at least not until after his alleged fall immediately upon entering the restroom. The mark, as described by Mr. Cross, would not appear to be a mark left by the tip of a crutch.
... [A]fter plaintiff's initial [knee] injury [a few weeks earlier], Dr. Brown had prescribed a leg brace and the use of crutches and instructed the plaintiff to refrain from any weight bearing on the injured leg. However, [plaintiff's] girlfriend ... during this period of time testified that the plaintiff did not use his crutches at all times ... [even] before any alleged accident at Wendy's Restaurant.
... [Plaintiff] testified that as he fell, both knees struck the floor.... However, in the history plaintiff gave to his doctor, Dr.... Brown [the next day], the plaintiff described that "... he took all of the weight on his left leg,["] but he did not describe a fall.
(Our brackets.)
After discussing many other inconsistencies in Gilley's testimony, the court stated:
[T]his Court took copious notes during the jury trial and remembers well the testimony and demeanor of the plaintiff. This Court was unimpressed with the veracity and demeanor of the plaintiff. The plaintiff was simply his own worst enemy and his testimony did not appear to be completely truthful and forthright....
[A]fter much soul searching and detailed examination of the record, ... this Court... is simply not preponderantly convinced that the plaintiff suffered a fall in the restroom of Wendy's Restaurant and/or that it caused an aggravation of his admittedly pre-existing injury. Therefore, this Court must conclude that the plaintiff has not proven his case by the required preponderance of the evidence and his cause must be dismissed ....
(Our emphasis and paragraphs.)

DISCUSSION
Grant of New Trial
Gilley's first argument on appeal is that the trial court abused its discretion by granting a new trial instead of a JNOV.
Gilley contends a jury's failure to award general damages after finding the defendant *523 liable and awarding the plaintiff medical expenses is an error of law which may be corrected by JNOV. La. C.C.P. art. 1811; Sumrall v. Sumrall, 612 So.2d 1010 (La.App. 2d Cir.1993); Daigle v. U.S. Fidelity & Guar. Ins. Co., 94-0304 (La.App. 1st Cir.5/5/95), 655 So.2d 431. Claiming the inconsistency in the jury's award of damages here was "a limited error of law" which had nothing to do with the issue of liability, Gilley contends the trial court "improperly used the legal error ... [as to] damages ... as a vehicle to revisit the jury's liability determination and to replace the trial court for the jury as the primary trier of fact."
Gilley's argument is not supported by this record. In their respective post-trial motions, both Gilley and Wendy's asserted that the jury's verdict as to liability was factually erroneous and inconsistent in different respects. Gilley challenged the jury's assessment of 40 percent fault to him and Wendy's questioned whether Gilley proved by a preponderance of the evidence that he fell in the restroom at Wendy's. The granting of a new trial rather than a JNOV is entirely permissible and proper when a jury's verdict is challenged on factual grounds. Gibson v. Bossier City Gen. Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991); United Group v. Vinson, 27,739 (La.App.2d Cir.1/25/96), 666 So.2d 1338, writ denied.
A new trial may be granted when the jury's verdict, while free of legal error, does not do substantial justice or is against the manifest weight and probative effect of the evidence. La. C.C.P. arts.1971-1973; Pellerin v. Tudor Constr. Co., 414 So.2d 403 (La.App. 1st Cir.1982), writ denied. In ruling on a motion for new trial, the court is not constrained to view the evidence in favor of the party who prevailed at trial, but may reach its own conclusions as to the weight of the evidence and may affirmatively consider whether the jury erred in giving too much credence to an unreliable witness, particularly when that witness's testimony is the sole evidence of a fact essential to a finding of liability. Pellerin, supra; Barlow v. State Farm Mut. Auto. Ins. Co., 93-2385 (La.App. 1st Cir.11/10/94), 645 So.2d 1256, writ denied; May v. Jones, 28,106 (La.App.2d Cir.5/8/96), 675 So.2d 275, writ denied.
We find the trial court here clearly acted within these guidelines and did not abuse its discretion in granting a new trial. Gilley's suggestion that the court's ruling was a procedurally unorthodox method for "usurp[ing] the jury's fact-finding prerogative" when the matter was retried is also not supported by the record. The court became the trier of fact in the second trial not because of its grant of a new trial, but by virtue of the joint stipulation of the parties a few months after the grant of the new trial, waiving their right to a jury trial and agreeing to submit the evidence from the first trial to the court for decision.

Findings on Retrial
Emphasizing that the court's decision on retrial is contrary to the findings of the jury in the first trial, Gilley contends the court was clearly wrong in concluding he did not prove that he fell in the restroom at Wendy's or that the fall aggravated his prior knee injury.
Gilley's argument overlooks the fact that the granting of a new trial has the effect of vacating and setting aside the original judgment. Carrier Leasing Corp. v. Ready-Mix Companies, Inc., 372 So.2d 601 (La.App. 4th Cir.1979), writ denied. On the appeal of the subsequent judgment, the reviewing court does not compare the later judgment to the earlier judgment, even when the two judgments pronounce contrary results. The reviewing court disregards the judgment that was set aside and reviews the subsequent judgment under the usual standards of appellate review (manifest error, abuse of discretion) in light of the evidence in the record. See and compare Wilson v. Compass Dockside, Inc., 93-1860 (La. App. 4th Cir.3/15/94), 635 So.2d 1171, writ denied, and Hawthorne v. Hawthorne, 96-89 (La.App. 3d Cir.5/22/96), 676 So.2d 619, writ denied.
Applying these standards to the present case, we find no clear error in the court's factual findings on retrial. The record supports the court's lengthy and detailed reasons *524 for discrediting Gilley's account of the unwitnessed fall.

DECREE
At Gilley's cost, the judgment is AFFIRMED.