WICKER, J.
*789 The instant appeal, in which appellant appears pro se , arises from a February 12, 2015 auto and bike accident between appellant, King George Murray, III, and appellee, Brett Michael Windmann. Mr. Murray seeks review of the July 13, 2018 judgment of the trial court adopting the jury determination that Mr. Windmann was negligent, but was not the legal cause of the accident. For the reasons following, we affirm the judgment of the trial court.
FACTS AND PROCEDURAL HISTORY
On February 12, 2015, Mr. Murray and Mr. Windmann were involved in an auto and bike collision at the intersection of Airline Drive and Shrewsbury Road in Metairie, Louisiana. Mr. Murray, the bicyclist, brought suit against, defendant-driver, Mr. Windmann, and his insurer - Liberty Mutual Corporation[1] - in the Twenty-Fourth Judicial District Court on February 10, 2016, seeking damages and a trial by jury. On June 18, 2018, the matter proceeded to trial by jury.
At trial, Trooper Chris Ledoux, of the Louisiana State Police Troop B, testified that he responded to an accident at 9:24 a.m. on February 12, 2015, at the intersection of U.S. 61 (Airline Drive) and Shrewsbury Road. Upon arrival, he observed a blue Chevy Malibu "somewhat on Shrewsbury, almost partially in the right lane of Airline" and a bicycle. Trooper Ledoux spoke with Mr. Windmann, Mr. Murray, and a witness, Ms. Debra Primo, at the scene of the accident.
Trooper Ledoux testified that Ms. Primo in her statement said that she saw the collision as she was the first car in line at a stop light at the intersection of Airline Drive and Severn Avenue. According to Ms. Primo's statement, while waiting for the light to turn green, she saw Mr. Murray pedaling his bicycle toward Kenner. As Mr. Windmann was making a right turn on red, Mr. Murray did not stop or slow down prior to impact.
Trooper Ledoux further testified that he spoke to Mr. Windmann, who stated that his car was stopped in the right lane headed northbound on Shrewsbury Avenue, and he was waiting for traffic to clear so that he could make a right turn onto Airline. According to Mr. Windmann, he saw that southbound traffic on Airline had cleared and he proceeded to turn right on red. At that time, he noticed Mr. Murray on a bicycle directly in his path and applied his brakes, but was unable to avoid the collision. Mr. Windmann informed Officer Ledoux that he did not look to his right before initiating his turn.
Trooper Ledoux also spoke with Mr. Murray, who stated that he was traveling against traffic on Airline Highway from the direction of the traffic circle at Airline and Causeway, when "the vehicle" pulled out in front of him and hit him. Mr. Murray told Trooper Ledoux that he was on the gravel portion along the south side of Airline. When asked by defense counsel if *790 Mr. Murray could have avoided the accident, Trooper Ledoux testified:
In my opinion? Bicyclists, you generally have a shorter stopping distance than cars and there wasn't any obstructions in his path, so more than likely he probably - more than likely, I would say that if he was paying attention and he saw the car, he could have stopped in time.
Trooper Ledoux also observed minor damages to the Chevrolet Malibu on the front bumper and hood area. He further testified that it was not illegal for Mr. Windmann to make a right turn at the red light at the intersection of Airline and Shrewsbury and that there were no signs erected along the intersection that said "no turn on red."
On cross, Trooper Ledoux testified that he investigated between 150 and 180 automobile accidents each year. Of these accidents, only five or six have involved bicycles. He explained that a bicycle must abide by the same laws as vehicles, with the exception that they can ride on the shoulder and are also limited in the number of places they can ride. Trooper Ledoux further explained that a bicyclist should be riding with traffic and not against it. After conducting his investigation, Trooper Ledoux found that Mr. Murray broke the law by traveling against traffic and gave him a citation.
On the second day of trial, Mr. Murray's counsel called Dr. Mahmoud M. Sarmini who was tendered as an expert in physical medicine and rehabilitation medicine, including pain management. He testified that he first evaluated Mr. Murray on June 7, 2013 - prior to the accident at issue - for chronic lower back pain. On August 7, 2014, Mr. Murray had a follow-up visit regarding his back pain wherein he informed Dr. Sarmini that he experienced mild leg weakness which resulted in occasional falls. Dr. Sarmini evaluated Mr. Murray again on January 14, 2016, at which time he complained of increased back pain and a newly raised complaint of neck pain. During this visit, Mr. Murray reported to Dr. Sarmini that he was involved in an auto and bike accident in February of 2015, which led to increased back pain and an onset of neck pain, which Dr. Sarmini treated with several medications. Dr. Sarmini also ordered a CT scan of Mr. Murray's lumbar spine because Mr. Murray continued to complain of back pain and expressed that he experienced weakness in his left leg. Again, Dr. Sarmini prescribed nerve medication and discussed the possibility of physical therapy which would focus on developing muscle strength in Mr. Murray's back and neck as well as help with pain. Mr. Murray attended one 15-minute physical therapy session. Dr. Sarmini further testified that on August 12, 2016, Mr. Murray visited his office complaining of neck and back pain which had been aggravated after Mr. Murray slipped and fell in his dentist's office.
On February 17, 2017, Mr. Murray indicated to Dr. Sarmini that he underwent epidural steroid injections at C7-T1 (the last vertebra of the thoracic spine) on January 17, 2017, which did not help to alleviate his pain. Dr. Sarmini stated that prior to Mr. Murray's bike accident, he never mentioned neck pain. However, after the bike accident, Mr. Murray indicated that he had some intensification of his back pain and a new onset of neck pain. Dr. Sarmini further testified that Mr. Murray's neck pain is likely correlated to his accident.
Mr. Murray then visited with Dr. Sarmini again on July 18, 2017, at which time Mr. Murray stated that his neck and back pain became worse after a slip and fall accident and Mr. Murray further mentioned that he was hit by another car on March 21, 2017. Mr. Murray's final visit to *791 Dr. Sarmini occurred on November 13, 2017, at which time Mr. Murray informed Dr. Sarmini of a new fall.
Mr. Murray also testified that on February 12, 2015, the date of the accident at issue, he was on his bicycle headed to the gas station prior to going to work, as was his daily custom, when he was struck by Mr. Windmann's vehicle while attempting to cross the intersection of Shrewsbury and Airline.
On cross examination, Mr. Murray testified that he was running late for work at the time of the accident but was not in a rush because he had contacted his employer. He proceeded down the Causeway/Airline Circle off-ramp with the flow of traffic on the right side of Airline Drive. Since the gas station he visits every morning for his orange juice is on the left side of the road, near the intersection of Airline Drive and Shrewsbury, Mr. Murray dismounted his bike and "ran" across six lanes of traffic to a "grassy area" near the intersection of Airline Drive and Shrewsbury. Mr. Murray testified that he saw Mr. Windmann's Chevy Malibu in the right lane at the intersection and decided to cross in front of it, as it was a pedestrian crossway. He testified that he noticed that Mr. Windmann was looking left and that Mr. Murray paused for five to ten seconds before crossing the intersection, as he believed the traffic was too close to Mr. Windmann for him to turn. Mr. Murray further testified that he waved at Mr. Windmann in an effort to get his attention before proceeding, however, Mr. Windmann continued to look to the left, so he waited until traffic "got so close upon him that I figured he wasn't going to turn. And when I went out there, that's when he gunned his - he gunned and hit it." Mr. Murray stated that at the time of the accident, he had just put his foot on the pedal and gave himself "a push." He stated that Mr. Windmann's wheels were the only thing turned and that Mr. Windmann had not yet made a partial turn. Mr. Murray stated that the vehicle hit both his bike and his left thigh and caused his medication to fall out of his pocket and onto the street. He explained that right after the accident, he asked Mr. Windmann to contact his wife and shortly thereafter he was taken to the hospital.
When asked about the location of Mr. Windmann's vehicle immediately prior to and at the time of the accident, Mr. Murray stated that it was "behind the white line." However, Mr. Murray testified that he was struck by the middle of defendant's car, on his left side. Mr. Murray stated that when he was hit, he was thrown off his bike, rolled over the hood of Mr. Windmann's vehicle, his back slammed against the windshield and his right leg slammed against the top of the car and he then slid down on his head.
Mr. Murray testified that he immediately felt pain in his neck, back, shoulders, and his right leg. According to Mr. Murray, he next remembers being attended to by EMS and speaking with Trooper Ledoux. Mr. Murray testified that Trooper Ledoux asked Mr. Murray where he had come from and Mr. Murray responded "I told him up there. That's all I say. I didn't tell him I was coming down or which side. He assumed what he wrote." According to Mr. Murray, he was x-rayed and admitted for medical observation in the emergency room. After Mr. Murray was in the observation room for approximately 20 or 30 minutes, Trooper Ledoux entered his room. Mr. Murray testified that Trooper Ledoux informed him that his bike was in the front of the hospital at security and that Mr. Murray was not "supposed to be up there riding a bike." Mr. Murray responded that he "should sue the state because y'all ain't got no sign up there saying pedestrian prohibited, so he got angry. He *792 left and came back with a ticket, saying I find you at fault." Mr. Murray testified that the district attorney chose not to pursue the ticket.
Mr. Murray testified that he was released from the hospital on the date of the accident and that, a few days later, he experienced pain in his neck, shoulders, and back. Mr. Murray went to Ochsner Hospital's emergency room where he was given unspecified medication, placed in an examination room, and then sent home. Prior to being released, Mr. Murray was told to contact Dr. Sarmini to schedule an appointment. After contacting Dr. Sarmini, Mr. Murray underwent an examination wherein he alleges Dr. Sarmini concluded that Mr. Murray's right leg was not getting enough blood flow as a result of the accident. Mr. Murray also stated that he was referred to Ochsner Baptist to see Dr. Walsh who administered epidural shots to his back on four occasions. Mr. Murray testified that the shots were non-effective and that on his next visit to Dr. Sarmini, they discussed the possibility of Mr. Murray having surgery. Mr. Murray stated that he did not have the surgery because of his mother's passing and the need for him to travel back and forth to Monroe because of "family problems." Mr. Murray also testified that he was unable to go to his therapy sessions because of financial difficulties.
Mr. Murray testified that on the date of the accident, he was headed to his job at Super 8 Motel where he worked as a maintenance man. At the time of the incident, he was making $ 10 per hour. Mr. Murray testified that after the accident he missed a lot of work and was fired.
Ms. Primo testified that she witnessed the accident at issue. She testified that she was the first car in line in the left lane on Severn Avenue, facing Airline, waiting on the red light to turn green. She testified that she was sitting at the red light listening to music and looking straight ahead on Severn Avenue when she saw Mr. Windmann's car "out of the left peripheral vision." According to Ms. Primo, Mr. Murray was riding his bike on the street about two or three car lengths away from the intersection of Airline and Shrewsbury and she noticed him about "a second or two before impact." She stated:
And all of a sudden, I saw something out of the left peripheral vision and it was a man on a bicycle and I thought, Oh, my god, he's going to hit that car, because he did not slow down and he hit the car and that's when the impact occurred.
She further testified that she could not see the bottom of Mr. Murray's bike wheels which she testified were on the asphalt of the street prior to impact. Regarding the speed of Mr. Windmann's turn, Ms. Primo testified that prior to impact, Mr. Windmann was turning right "probably very, very slowly, like you would do when you are creeping out to see if there's other cars coming."
When asked whether Mr. Windmann's car "actually impacted" Mr. Murray, Ms. Primo responded, "Mr. Murray ran into the car." With regard to the impact, Ms. Primo testified that:
[Mr. Murray] hit the car. He went to his right and his back hit against the windshield and then he slid off of the car right in front of the driver's side door by the wheel and he seemed to stop his impact with his hand. And he laid there straight.
* * *
He was by the front quarter panel. He fell. He hit the roof. He hit the hood. His back hit the windshield and slid right before the driver's side door right by the wheel.
*793 Upon seeing the impact, Ms. Primo testified that several cars stopped and pulled over. Mr. Murray was lying on the ground faced down, with his hands next to him. The bike was lying next to the car.
Mr. Windmann testified that he works for Wesco Distribution and on the morning of the accident, he was in route to a vendor. He stated that he passes through the Shrewsbury and Airline intersection every day to travel from work to see customers. According to Mr. Windmann, on the morning of the accident, around 9:00 a.m. he arrived at the intersection of Airline and Shrewsbury intending to turn right "to get on the on-ramp to the Causeway loop" to go toward the lake. The light was red and he stopped behind the white line. There were a lot of cars at the intersection so he was not immediately able to turn right.
Mr. Windmann explained that when he arrived at the intersection, he saw a red light and came to a stop. There was no one walking in the area or riding a bike in the area at that time. He further explained he only looked left before turning to see if traffic was coming. As to why he did not look right before turning, Mr. Windmann testified:
No. There's really no reason. There's no shoulder there and I didn't expect to have, you know, anybody coming the wrong side of the highway in the middle of the street.
Mr. Windmann further testified:
Well, I said in my deposition from what I remember is, the traffic was so heavy that morning that, you know, when you're looking left to make a right hand turn, you can see -- if there's a lot of traffic -- I was watching the traffic. And then I saw the cars starting to slow down. So when I noticed they were starting to slow down, that's when I started to creep up a little bit.
And then by the time I went to accelerate, that's when the light had already turned green. And when I -- as soon as I went to accelerate, I saw him, Mr. Murray out of my peripheral vision. I slammed on my brakes and then that's when the impact happened.
Mr. Windmann testified that after the impact, he got out of the car to check on Mr. Murray who was lying face down. Mr. Murray asked that Mr. Windmann contact someone for him and shortly thereafter, the police arrived.
Mr. Robert Douglas - an expert in traffic engineering and accident reconstruction - testified at trial that he was retained in January 2017 to examine the intersection of Shrewsbury and Severn at Airline Drive. After reviewing the depositions of Mr. Murray and Mr. Windmann and visiting the intersection where the accident occurred on four separate occasions, Mr. Douglas drafted a report.
In reviewing his findings, Mr. Douglas testified that had Mr. Windmann been at the stop bar or white line, which is 15 feet from the curb, he would have had a clear vision of Mr. Murray "who had gotten off his bicycle, according to him, and - or straddled his bike so that it was standing at the location." Mr. Douglas further testified:
Okay. I think we are all well aware of the right turn on red. In most areas of Jefferson Parish, you are allowed to turn right on red unless restricted. But you also have to yield to any pedestrian or bicyclist or anybody who is going to be in the proximity of the crosswalk; or if there is no crosswalk, where a crosswalk would be.
Finally, Mr. Douglas testified that had Mr. Windmann looked right prior to turning, the accident would not have happened.
*794 On cross, Mr. Douglas testified that during his most recent visit to the accident site, he saw pedestrians and bicyclists at the intersection but was unaware from where they came. He further testified that he had not interviewed Trooper Ledoux, Mr. Murray, or Ms. Primo prior to making his report. Regarding the route taken by Mr. Murray on the date of the accident, Mr. Douglas explained that Mr. Murray's route along the traffic circle was the best route to take, although it is not pedestrian friendly.
As it relates to the duty of the bicyclist, Mr. Douglas testified:
They to [sic] have do the same. They have to make sure that they are moving with the signals, that they are protected according to the way that the traffic is moving. They have to make sure that they don't cut it front of somebody. And if they become pedestrians, then they have to know what the pedestrian rules are.
He further testified that a bicyclist traveling on a highway is to travel with the flow of traffic. Finally, Mr. Douglas testified that this was a low impact accident.
At the conclusion of Mr. Douglas' testimony, plaintiff and defense counsel rested and the matter was submitted to the jury. On June 19, 2018, the jury found that Mr. Windmann was negligent in the accident, but that his negligence was not a legal cause of the February 12, 2015 accident. The trial court adopted the jury's verdict in a July 13, 2018 judgment.
ASSIGNMENTS OF ERROR
On Appeal, Mr. Murray asserts three assignments of error which we find appropriate to rephrase as follows:
(1) Whether the jury verdict is contrary to law and evidence?
(2) Whether Mr. Murray's counsel provided ineffective assistance in failing to object to statements made by defense counsel during closing arguments?
(3) Whether Mr. Murray's Sixth, Eighth, and Fourteenth Amendment rights were violated by his counsel and opposing counsel throughout the trial of his civil case?
DISCUSSION
Contrary to Law and Evidence
On appeal, Mr. Murray maintains that the jury's verdict was contrary to the law and evidence presented at trial. La. C.C.P. art. 1972 states:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
United Group of Nat. Paper Distributors, Inc. v. Vinson , 27,739 (La. App. 2 Cir. 1/25/96), 666 So.2d 1338. A new trial may be granted when the jury verdict, while free of legal error, does not do substantial justice or is against the manifest weight and probative effect of the evidence. La. C.C.P. arts 1971, 1972, 1973 and Gilley v. Wendy's Inc. , 31,353 (La. App. 2 Cir. 12/9/98), 723 So.2d 517. A jury verdict cannot be set aside on a motion for a new trial on the grounds that the verdict is contrary to the evidence if it is supportable by any fair interpretation of the evidence.
*795 Yokum v. Funky 544 Rhythm and Blues Cafe , 16-1142 (La. App. 4 Cir. 5/23/18), 248 So.3d 723.
Courts of appeal have long held that a jury's finding may not be set aside unless it is clearly wrong or manifestly erroneous. Snider v. Louisiana Med. Mut. Ins. Co. , 14-1964 (La. 5/5/15), 169 So.3d 319, 323 ; Alexander v. Pellerin Marble & Granite , 630 So.2d 706, 710 (La. 1994). Thus, a reviewing court does not attempt to resolve whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Frazier v. Shady , 50,821 (La. App. 2 Cir. 8/10/16), 200 So.3d 874, 876 ; Freeman v. Poulan/Weed Eater , 630 So.2d 733, 737-38 (La. 1994). Even if an appellate court considers its own evaluations and inferences to be more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Philips v. Berner , 00-0103 (La. App. 4 Cir. 5/16/01), 789 So.2d 41, 44-45, writ denied , 01-1767 (La. 9/28/01), 798 So.2d 119 ; Banks v. Jack Jackson, Inc. , 01-3 (La. App. 5 Cir. 5/30/01), 788 So.2d 709, 712-13 ; Miller v. Clout , 03-0091 (La. 10/21/03), 857 So.2d 458, 462. Therefore, if the record reveals a reasonable basis for the jury's determinations, the verdict must stand. Handy v. Owens Corning Corp. , 18-0491 (La. App. 4 Cir. 12/26/18), 262 So.3d 965, 968, writ denied , 19-0153 (La. 3/18/19), 267 So.3d 90.
At trial, Trooper Ledoux testified that, at the scene of the accident, Mr. Murray was riding against the flow of traffic and, had he been paying attention, Mr. Murray could have prevented the accident. Specially, Trooper Ledoux testified:
In my opinion? Bicyclists, you generally have a shorter stopping distance than cars and there wasn't any obstructions in his path, so more than likely he probably - more than likely, I would say that if he was paying attention and he saw the care, he could have stopped in time.
Furthermore, jurors heard testimony from Trooper Ledoux stating that Mr. Murray broke the law by riding against the flow of traffic on his bicycle and received a citation.
Ms. Primo, who witnessed the accident, testified that she saw Mr. Murray a few seconds before the collision and that while Mr. Windmann was turning "very, very" slowly, Mr. Murray was traveling with such speed on his bike that she believed that Mr. Murray hit Mr. Windmann.
Jurors also heard Mr. Windmann's testimony that at the time of the accident, he was looking at on-coming traffic to his left and had not looked to his right, where Mr. Murray was located, as he was not expecting anyone to come from that direction. When he began to turn, he noticed Mr. Murray and applied his breaks, but could not avoid the collision.
Mr. Murray testified that he had been traveling with the flow of traffic on his way to work when he wanted to stop to purchase orange juice from a store near his place of employment - which was his custom. Mr. Murray testified that when he arrived at the intersection, he noticed that Mr. Windmann had not looked over to the area where he was standing with his bike. According to Mr. Murray, after waiting five to ten seconds, he proceeded in front of Mr. Windmann's car. Mr. Murray testified that he was sure Mr. Windmann had not seen him prior to proceeding on bike in front of Mr. Windmann's vehicle.
Finally, the jury heard the testimony of Mr. Douglas - an expert in traffic engineering and accident reconstruction. Mr. Douglas testified that drivers have a duty to look in all directions before turning and that bicyclists have a duty to ride with the flow of traffic.
*796 At the conclusion of the Mr. Murray's case in chief, the jury returned a verdict finding Mr. Windmann negligent in the February 12, 2015 accident, but that his negligence was not the legal cause of the accident.
Under the facts of this case as presented at trial, we cannot say that the jury's determination was manifestly erroneous or unsupported by the evidence. The jury was provided conflicting testimony as to the fault of both parties and the circumstances surrounding the accident. Accordingly, we are unable to conclude that the jury's findings are in error.
Ineffective Assistance of Counsel
In his second assignment of error, Mr. Murray avers his counsel provided ineffective assistance in failing to object to statements made by defense counsel during closing arguments. Specifically, Mr. Murray states:
Ms./Mrs. Stacie J. Fitzpatrick willingly and knowingly mislead and misguided plus deceived the jury and corrupted the jury mind against me, when she made 100% false lies against me, and while my so call attorney's well knew that she was lying and had the proof (100%) inside the courtroom, I quickly moved and told my attorney's to object to this they both refused; in (which I will get to them in a few minutes.)
* * *
Also Mr. Thomas L. Smith and Mr. Mauricio Sierra also clearly heard Ms. Mrs. Stacie J. Fitzpatrick make the statement in open court that she never saw any type of my work W2's and I moved quickly to ask Thomas L. Smith and Mauricio Sierra to object, even beg them but yet both willingly refused me and Mr. Mauricio Sierra told me to sit down or I will be thrown in jail.
The June 19, 2018, trial transcript shows that during closing arguments, opposing counsel stated:
Another aspect of this case, ladies and gentlemen, that I completely disagree on is the plaintiff's claim for lost wages and future lost wages. Now, we've only heard maybe two sentences of testimony from Mr. Murray where he said at the time of the accident he was working for Super 8, he was earning $ 9 an hour, and supposedly he, you know, was going to make $ 10 an hour and all that. That's it. That's all we heard. That is not sufficient for him to meet his burden of proof for lost wages.
He did not talk about the hours that he worked. What was his schedule? Was he full-time? Was he part-time? And one thing that, again, we're missing that has never been introduced into evidence or introduced as exhibits or even testimony to substantiate any lost wage claim is his employment record. We have none of that. We have no records from Super 8. We have no tax records to substantiate this lost wage claim. We've never seen any tax records introduced or any W-2s or anything like that. So I don't think it's enough for him to say, oh, I was making $ 9 an hour. I don't think that's enough.
* * *
So again, for future lost wages, I'm going to ask you to not award anything, and for past lost wages I'm going to ask you to not award anything because there is absolutely nothing that's submitted into evidence to prove that.
As it relates to the statements made by opposing counsel, in providing opening instructions to the jury, the trial court stated, in part:
The arguments that the lawyers will make to you in opening and closing statements aren't evidence. Your decision *797 on the facts must be based on the testimony and the evidence that you hear and see.
Courts have found that instructions given to the jury prior to opening arguments and closing arguments informing them that counsel's statements are not evidence and that their determinations are to be based solely on the evidence and not upon the statements or suggestions of the attorneys served to counteract any possible adverse effect of opposing counsel's argument. See Cooper v. United Southern Assur. Co. , 97-0250 (La. App. 1 Cir. 9/9/98), 718 So.2d 1029 ; Kelly v. Riles , 99-601 (La. App. 5 Cir. 12/15/99), 751 So.2d 302, 308 ; and Sims v. Ward , 05-0278 (La. App. 1 Cir. 6/9/06), 938 So.2d 702, 709.[2]
Therefore we find Mr. Murray's second assignment of error to be without merit.
Constitutional Rights Violations
In his final assignment of error, Mr. Murray alleges that his counsel and opposing counsel violated his constitutional right to effective counsel throughout his civil case. Specifically, Mr. Murray alleges that his counsel violated his Sixth "or" Eighth Amendment rights, and that both his counsel and opposing counsel violated his Fourteenth Amendment rights. This Court has previously declined to consider such arguments and found that "the inadequacy of an attorney in a civil suit is not enough to evoke constitutional concern". Karagiannopoulos v. State Farm Fire & Cas. Co. , 94-1048 (La. App. 5 Cir. 11/10/99), 752 So.2d 202, 209, writ denied , 99-2866 (La. 12/10/99), 752 So.2d 165, and writ denied , 99-3474 (La. 2/11/00), 754 So.2d 940. Moreover, it is established that such constitutional guarantees, including the right to counsel and the protection from cruel and unusual punishment, arise only under certain circumstances, typically involving criminal convictions, and do not govern or apply to civil cases involving the alleged negligence of an individual, private defendant. See Turner v. Rogers , 564 U.S. 431, 441, 131 S.Ct. 2507, 2516, 180 L.Ed. 2d 452 (2011) ; Palermo v. Rorex , 806 F.2d 1266, 1271 (5th Cir. 1987). Accordingly, we decline to consider Mr. Murray's constitutional arguments in this appeal.
CONCLUSION
For the aforementioned reasons, we affirm the July 13, 2018 judgment of the trial court adopting the jury determination finding Mr. Windmann was negligent in the February 12, 2015 accident, but was not the legal cause of the accident, and dismissing Mr. Murray's suit with prejudice.
AFFIRMED

Mr. Windmann, who was employed by Wesco Distribution Inc., was operating a company vehicle at the time of the accident and thus Wesco's insurer, Liberty Mutual, was named as the defendant-insurer.

Moreover, as pointed out by defense counsel on appeal, Mr. Murray failed to introduce any tax returns, W-2 forms, or documentary evidence from his employer to verify or support his allegations concerning his alleged lost wages.